The **UNITED STATES** of America

v.

**Bernard L. MONROE et al.**

**Crim. No. 75–317.**

United States District Court,
District of Columbia.

July 11, 1975.

Sol Rosen, Washington, D. C., for defendant Bernard L. Monroe.

William J. Garber, Washington, D. C., for defendant Janice McNair.

Theodore J. Christensen, Washington, D. C., for defendant Robert L. Brooks.

James M. Hanny, Asst. U. S. Atty., Washington, D. C., for plaintiff United States.

## MEMORANDUM OPINION

PARKER, District Judge.

The defendants, Bernard L. Monroe, Janice McNair and Robert L. Brooks, have been named in a three-count indictment charging them with forgery and uttering of a U. S. Treasury check, 18 U.S.Code, § 495 and possession of stolen mail matter, 18 U.S.Code § 1708. On the day of their arrest and prior to presentment before a magistrate, each

defendant gave a written statement to U. S. Secret Service Agents.

Motions to suppress the statements were filed on behalf of Monroe and McNair. Counsel for Brooks moved and was granted leave to adopt the motions of the co-defendants. The defendants contend that their statements were made while each was under the influence of narcotics and as the result of narcotic intoxication the statements were involuntarily given. Monroe further contended that he did not voluntarily waive his right to counsel.

The testimony of the arresting Agents and the defendants Monroe and McNair on the issues presented was concluded on July 7th and followed by argument of counsel.

Having considered the testimony, exhibits and arguments, the Court in this memorandum, which constitutes findings of fact, sets forth the reasons why the motion should be granted as to the defendants Bernard L. Monroe and Janice McNair and denied as to the defendant Robert Brooks.

The three defendants were arrested by Secret Service Agents in the early afternoon of April 9, 1975 at a branch of the American Security and Trust Co. Thereafter they were taken to the field office of the Secret Service, a few blocks away, arriving around 2 o'clock p. m. They were detained at that office for at least four and one-half hours. During this time they gave the challenged statements to the government Agents. They were not taken before the United States Magistrate until the early afternoon of the following day, April 10, 1975.

At the hearing on the motions testimony was offered by Agents Holmes, Williams, Cahill and Moore and the defendants Monroe and McNair. An analysis of the issues presented by the defendants' motions follows.

### Bernard L. Monroe

Bernard L. Monroe was orally advised of his rights by Agent Holmes at the bank and indicated by shaking his head affirmatively that he understood. En route to the field office the defendant was again orally advised of his rights by Agent Williams who read from the "rights card." Monroe indicated that he understood his rights and also volunteered that, having experienced similar situations when arrested in the past, he was familiar with the reading of rights procedure. Immediately upon arriving at the field office, and before 2:15 p. m., the defendant signed the Warning and Waiver of Rights form, read to him by Agents Williams and Cahill.

The three Agents testified that through this time, except for one or two instances of nervousness, Monroe exhibited no signs of narcotic influence and that there was nothing unusual about his behavior.

The defendant's testimony on these events suggests that he was unaware of being advised of his rights and that he was unaware of executing the warning and waiver forms. The Court has no difficulty in resolving these issues in favor of the prosecution and against the defendant.

The sequence of events which followed, however, presents serious questions of the voluntariness of the statements given by this defendant, nearly three hours later, and whether he knowingly and intelligently waived his rights.

This defendant's statement was secured at 4:50 p. m. by Agent Cahill. No plausible or acceptable explanation was offered by this Agent for the unusual lapse of time before it was secured. While Cahill stated that at all times Monroe responded to questions and appeared rational and otherwise was very cooperative, he also testified that during that period the defendant complained of being tired, and on occasions rested his head in his hands. In response to Cahill's questions, Monroe admitted that he was taking and had taken narcotics. Not satisfied with the defendant's answer, Cahill then sought and received confirmation of this disclosure from the defendant Brooks, who was in an adjoin-

ing room. Cahill further testified that at one point during the questioning Monroe appeared to him as being under the influence of narcotics. When he asked if he were "high", however, the defendant failed to give a response. The Personal History Summary of this defendant, prepared by Agent Holmes, clearly confirms that he was an addict. On the heels of this, Agent Cahill continued his interrogation of Monroe.

The defendant testified that he had been using hard drugs since 1942 and at one time had been involved in several treatment programs. His FBI record showed that he had been incarcerated several years ago at the Federal Correctional Institution, Danbury, Connecticut. He admitted that he used hard drugs on the morning of April 9 and for a period of time before the arrest. He testified that he had told the agents that he was an addict and that he was under the influence of narcotics while being questioned, and that he was undergoing withdrawal symptoms while at the field office. The evidence also showed that when the defendant appeared before Magistrate Burnett the next day, he commented that it was then obvious that Monroe was undergoing withdrawal symptoms. This supports the defendant's statement that prior to his arrest he had been on hard narcotics.

Monroe also insisted that during the more than four hours he was at the field office he requested permission to call his attorney, a man he identified by name. Agent Cahill denied that Monroe's request was to speak to an attorney, but rather, that he identified the man he named as his "parole officer". It was not until 6 o'clock that Monroe was permitted to use the phone. He called this named individual, who was indeed his attorney. Agent Cahill also spoke to this individual briefly and testified that his conversation with him was about the processing of Monroe which had been concluded and the matter of when Monroe would be taken before a U. S. Magistrate. Monroe's claim is that he was de-nied his constitutional right to the presence of his requested attorney.

### Janice McNair

There is no question that this defendant was advised of her rights. When arrested at the bank, Agent Holmes orally advised her and the other two defendants and she responded affirmatively that she understood them. Upon her arrival at the field office, she acknowledged the reading of her rights by Agent Holmes and signed the "Warning of Rights" form at 2:10 p. m. The interview with Holmes, at which she gave certain oral statements, continued from 2:10 p. m. for approximately 30 to 45 minutes. On several occasions during that time she complained of her health and requested to see her doctor.

Holmes was then unaware that she was an addict. He testified that she was nervous, emotional and that she cried. Other than this, no unusual behavior or manifestations of discomfort associated with narcotic addiction or usage was noted.

The next Agent to have substantial contact was Williams who saw the defendant around 4:10 p. m. It was at this time that her signature was obtained on the "Waiver of Rights" and her written statement was secured.

The government's testimony does not clearly indicate this defendant's condition from the time she ceased to be interviewed by Agent Holmes (around 2:55 p. m.) or what happened to her until the questioning began by Agent Williams. Nor did the government justify to the Court's satisfaction why there was the two-hour delay in securing a statement from the time she was brought to the field office. In any event, at the time Williams began to question her he knew that she was an addict and on a methadone program. It was during this questioning that her written statement was secured. The defendant testified that she signed the statement only because she was hungry and sick. During the course of ques-

tioning by Agent Williams she asked for a doctor several times and the request was ignored; she requested medication and the request was ignored; she volunteered the information that she had medication in her purse but was not permitted to take it and she appeared nervous and cried at various intervals.

The defendant claimed that she was in regular attendance at a methadone clinic on 14th street where she was administered a daily dosage of 20 milligrams of methadone. In addition, she was taking medication three times daily, under a doctor's prescription. Her last intake of methadone was the morning of the preceding day, April 8th, and she had not had any methadone on the day of her arrest.

She further claimed that since enrollment in the program she had never been without methodone for more than 24 hours; that she had previously experienced methadone withdrawals which caused her to be sick, nervous and which triggered backaches and headaches causing her to cry.[1] Her testimony showed that she was experiencing those symptoms when Williams was questioning her and that medication would have alleviated her condition had she been allowed to take it. She testified that she wanted to call the doctor to verify her need for this medication. Agent Williams testified that he observed no indications of physical pain or discomfort, perspiration or sweating and she made no complaints of backaches, headaches, or chills during the period he questioned her.

The only other testimony concerning McNair's condition was that of Agent Moore who was with her when she was transported from the bank to the field office and who saw her on two occasions at the field office. During these observations he noticed nothing unusual about her appearance and saw no indication that she was under the influence of narcotic drugs. This limited time for observation (transporting her from the bank, and the two observations in the field office _ _ the first for one or two minutes and the second from three to four minutes) was hardly sufficient to allow a measured judgment.

### Analysis of the Monroe and McNair Claims

■ The issue presented by the Monroe and McNair motions is whether the statements secured from them were voluntarily and freely given at a time when they were in full possession of their faculties. And in this connection a heavy burden rests on the government to demonstrate that Monroe and McNair knowingly and intelligently waived their constitutional rights to remain silent and not incriminate themselves. The determination of whether there has been a knowing and intelligent waiver of constitutional rights "must depend, in each case, upon the particular facts and circumstances surrounding that case". *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). *Zerbst* makes clear that the simple signing of a waiver form cannot be dispositive on the issue of voluntariness.

In *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), the voluntariness of the defendant's confession was in issue. The defendant claimed that at the time of his confession he "was in pain from his wounds, gasping for breath and unable to talk long"; that "the police told him he could have no water and would not be left alone until he gave the answers the authorities desired"; and that "his will was affected by the drugs administered to him." All these charges were denied by the government. In remanding the case for a factual determination, the Supreme Court stated "if Jackson's version of the facts is accepted the confession was involuntary and inadmissible." 378 U.S. at 391–2, 84 S.Ct. at 1789. *See also Sims v. Georgia,* 385 U.S. 538, 87 S.Ct.

---

1. See the discussion on the physical characteristics of addiction and withdrawal in United States v. Moore, 158 U.S.App.D.C. 375,

486 F.2d 1139, 1229–1235 (dissenting opinion by Wright, J.) (1973).

639, 17 L.Ed.2d 593 (1967); *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). These cases make clear that a defendant's state of mind and health are to be considered by the Court in determining the factual and legal question of whether a waiver of constitutional rights was knowingly and intelligently made.

In *United States v. Poole,* 161 U.S.App.D.C. 289, 495 F.2d 115 (1974), the court was concerned with the voluntariness of defendant's waiver of constitutional rights and subsequent confession. The defendant challenged the waiver and confession on the grounds that he was a drug addict undergoing heroin withdrawal at the time. In upholding the admission of the confession, the appellate court looked carefully at the factual record and found that it supported the trial judge's determination that the defendant was not in withdrawal at the time and that his confession was in fact freely given without coercion of any kind. The court pointed out that the defendant "gave no indication—verbal or otherwise—that he was undergoing withdrawal . . . He did not complain about his physical condition; he did not appear to be in pain; his eyes did not appear to be running . . . ." 495 F.2d at 119.

 The factors which the Court of Appeals found absent in *Poole,* are in large measure present here as to both Monroe and McNair. Based on all the offered testimony the Court finds that the government has failed to show by a preponderance of the evidence that the statements of these defendants were made voluntarily or that there were knowing and intelligent waivers of their constitutional rights. To the contrary, the evidence clearly indicates that they were undergoing withdrawal at the time of their interrogation and that their waivers and statements were not "the product of a rational intellect and a free will." *Blackburn v. Alabama,* 361 U.S. 199, 208, 80 S.Ct. 274, 280, 4 L.Ed.2d 242 (1960). Their statements will therefore be suppressed.

Since the Court has determined that the government has not demonstrated that Monroe's statement was voluntarily given, the issue of whether or not he was denied access to his counsel during the period he was at the field office need not be reached.

### Robert Brooks

Agents Holmes, Williams, Cahill and Moore gave testimony regarding the defendant Brooks. When this defendant was first arrested he identified himself as Andrea Thompson, and was wearing female apparel. He was orally advised of his rights by Agent Holmes at the bank who testified that Brooks acknowledged an understanding of his rights by nodding his head affirmatively. The only thing unusual at that time was his apparent nervousness.

At the field office Holmes had an opportunity to observe Brooks at intervals over a period of 45 minutes to an hour. Nothing unusual about his conduct suggested in any way that at the time he was under the influence of narcotics, or undergoing withdrawal symptoms. Agents Williams and Cahill had some limited contact with Brooks at the field office. They testified that defendant appeared normal; they observed no indication of pain, discomfort or narcotic influence.

Agent Moore was with this defendant continuously for several hours after he arrived at the field office. He read to the defendant the Warning and Waiver of Rights form at around 2 o'clock p. m., shortly after arrival. After each paragraph of the form was read, Moore stopped, explained and inquired of the defendant if he understood. The defendant replied—"Yes, I do" and indicated a willingness to talk. Both sections of the form were signed by the defendant (as Andrea Thompson) at the same time. Agent Williams witnessed defendant's signature.

Agent Moore questioned Brooks for at least one and one-half hours until a

written statement was secured. During the questioning the defendant admitted that his true name was Robert L. Brooks. After the statement was typed the defendant read it and was asked if any errors were present or corrections were to be made. None were noted by him.

During the entire time that Moore was with the defendant, no signs of narcotic addiction were noted. The defendant stated that he was not an addict and an examination of his arms at the time confirmed the statement. The Agent testified that throughout the period of his contact the defendant was calm (except when he used a gesture to wipe away what the agent thought might have been a tear, but which he could not see or determine).

Throughout the questioning the defendant showed no manifestations of being under the influence of any drug or stimulant; he did not request medication, a doctor or an attorney; he otherwise appeared to understand what was going on at all times. There was no credible evidence whatsoever showing that the defendant was overreached, coerced or taken advantage of or that his statement was involuntary in any sense.

■ Defendant's contention that his confession was involuntary because of his status as a narcotics addict was unsupported. In a very similar case, the confession of an 18 year old youth was held voluntary despite his claim that it was induced by narcotics withdrawal, where the defendant did not make any complaints about his physical state nor appear to the interrogating officers to be in pain. *See United States v. Poole, supra. See also United States v. Ritter,* 456 F.2d 178 (10th Cir. 1972). On the basis of the evidence presented, therefore, this Court finds that the statements given to the Secret Service Agents by defendant Brooks were freely and voluntarily given after an intelligent waiver of his rights to have counsel present and to remain silent.

■ Any claim that Brooks' confession should be suppressed because of the overnight delay in bringing him before a magistrate for arraignment is likewise without merit. The relevant statute states, in effect, that a confession should not be held inadmissible due to delay in arraignment if it is made within six hours of arrest. 18 U.S.C. § 3501(c). In this case, the confession was made well within 2 or 3 hours of arrest, and it is the period between arrest and confession that is critical, rather than the period between arrest and arraignment. *See United States v. Del Porte,* 357 F. Supp. 969 (S.D.N.Y.), *aff'd sub nom., United States v. St. Jean,* 483 F.2d 1399 (2d Cir. 1973). The rule against unreasonable delay before arraignment was meant to prevent confessions being made because of the coercive effect of prolonged periods in isolated police custody. Where the confession is made voluntarily, after a free and intelligent waiver of the rights to counsel and to remain silent, however, it cannot be said that the rule has been violated. *See United States v. Poole, supra.*

■ Agent Moore testified that Brooks had stated that he was not an addict during the field office interview. This was confirmed immediately by an inspection of the defendant's arms. Moore recorded the defendant's denial of addiction in his handwritten notes. The following day the typed Personal History Summary was prepared by Agent Williams from Agent Moore's notes, but the form indicates that Brooks is indeed an addict. Defendant has demanded that these notes be produced under the Jencks Act, 18 U.S.C. § 3500, and if not produced, that Moore not be allowed to testify at trial. Agent Moore testified that the notes were unavailable, and that he had no idea where they were. The Jencks Act imposes no duty on law en-

forcement officers to retain rough notes of interviews when their contents are incorporated into official records and the notes are destroyed in good faith. *See United States v. Terrell,* 474 F.2d 872, 877 (2d Cir. 1973); *United States v. Moore,* 453 F.2d 601, 603–4 (3d Cir. 1971), *cert. denied,* 406 U.S. 925, 92 S. Ct. 1794, 32 L.Ed.2d 126 (1972); *Lugo v. United States,* 370 F.2d 992 (9th Cir. 1967) (agent allowed to testify regarding conversation overheard in Spanish, even though original Spanish notes had been destroyed as a matter of course after a report was typed up in English); *United States v. Comulada,* 340 F.2d 449 (2d Cir.), *cert. denied,* 380 U.S. 978, 85 S.Ct. 1343, 14 L.Ed.2d 272 (1965). There is one case from this Circuit which indicates that a "good faith" test should not be used where neither the report nor the notes were available to defendant, and where there had also been a prejudicial delay between the time of the offense and the arrest. *See Lee v. United States,* 125 U.S.App.D.C. 126, 368 F.2d 834 (1966).

In this case, however, the official typed report has been made available to defendant. The discrepancy between what Agent Moore testified was in his notes and what appeared in the official report regarding defendant's drug addiction does not imply that the notes were destroyed for bad motives. Nor was there any evidence from which such an inference would arise. Defendant will not be prejudiced by the nonproduction of the notes because he has access to the typed report which would support an assertion that he is, and was, an addict at the time of his arrest, if indeed, that be a fact.

The Court finds no justification to grant this defendant's motion.

The motions of the defendants Monroe and McNair are granted. The motion of the defendant Brooks is denied. And it is so ORDERED.