**Kevin J. ANDERSON, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–10297.**

Court of Appeals of Alaska.

Jan. 28, 2011.

Rex Lamont Butler, Rex Lamont Butler and Associates, Inc., Anchorage, for the Appellant.

Ann B. Black, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Daniel S. Sullivan, Attorney General, Juneau, for the Appellee.

---

**8.** *Alaska Ctr. for the Env't v. State,* 940 P.2d 916, 922 (Alaska 1997).

**9.** *Tobeluk,* 589 P.2d at 877 (citing *Valdez Dev. Co.,* 523 P.2d at 184).

Before: COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

## OPINION

COATS, Chief Judge.

While driving on a snowy day, Kevin J. Anderson hit and killed a pedestrian. The police investigated the accident but did not suspect Anderson of any wrongdoing. An officer told Anderson that he was required by statute to provide blood and urine samples for testing because he had been involved in an accident that caused death or serious physical injury to another person. They transported Anderson to a police substation.

At the substation, the police allowed Anderson to contact his attorney. After discussing the matter with his attorney, Anderson provided the requested samples. Based on the test results, which showed that Anderson's blood alcohol level was .08 percent and that he had consumed marijuana, the State charged Anderson with driving under the influence.[1]

Anderson filed a motion to suppress the evidence from his blood and urine samples. Anderson pointed out that the police had incorrectly advised him about their authority: the police could only require him to submit the blood and urine samples if they had probable cause to believe he had committed a crime.[2]

District Court Judge Alex Swiderski agreed that the police did not have statutory authority to seize Anderson's blood and urine samples. Because the police had misrepresented their authority to collect the samples, Judge Swiderski concluded that they had illegally detained Anderson when they transported him to the police substation. However Judge Swiderski concluded that Anderson's consultation with his attorney before providing the samples had insulated Anderson's consent from the officers' prior illegal conduct, and the consent was voluntary.

Anderson filed motions for reconsideration, arguing that he had not had a meaningful conversation with his attorney. Judge Swiderski denied the motions, finding that the evidence at the suppression hearing supported the conclusion that Anderson was able to meaningfully consult with his attorney.

After his motions for reconsideration were denied, Anderson had a bench trial based on stipulated facts. District Court Judge Gregory Motyka found him guilty of driving under the influence. Anderson appeals. We affirm his conviction.

### Discussion

■ When an illegal seizure or arrest by the police precedes a defendant's consent to search, the State must show that the defendant's subsequent consent was voluntary and not tainted by the illegal police conduct.[3] As just explained, Judge Swiderski ruled that Anderson's consultations with his attorney dissipated the taint from the officer's prior illegal conduct, and that his consent was voluntary. Anderson challenges both of these conclusions. Viewing the evidence in the light most favorable to the trial court's rulings, the record supports Judge Swiderski's decision.[4]

Judge Swiderski found that the officer's misrepresentation of authority was not intentional. Anderson does not challenge this finding on appeal, and it is supported by the record. The officer testified that he did not believe Anderson had committed a crime, and that when he requested the blood and urine samples, he was not investigating a crime or looking for evidence. He requested the samples because he believed he was required to by state law.

---

1. AS 28.35.030(a).

2. *State v. Blank,* 90 P.3d 156, 162 (Alaska 2004).

3. *Skjervem v. State,* 215 P.3d 1101, 1108–09 (Alaska App.2009); *Moore v. State,* 119 P.3d 1018, 1020–21 (Alaska App.2005); *see also Halberg v. State,* 903 P.2d 1090, 1094 (Alaska App. 1996) (citing *Brown v. Illinois,* 422 U.S. 590,

602, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975)) (other citations omitted).

4. *See Brown,* 422 U.S. at 602, 95 S.Ct. at 2261; *Frink v. State,* 597 P.2d 154, 168 (Alaska 1979); *McBath v. State,* 108 P.3d 241, 243–44 (Alaska App.2005); *Crawford v. State,* 100 P.3d 440, 444 (Alaska App.2004); *Halberg,* 903 P.2d at 1094.

Anderson was a forty-five-year-old lawyer and the police did not suspect him of any wrongdoing. The police were polite and courteous throughout the contact, and Anderson was not arrested at gunpoint, handcuffed, or surrounded by police officers. After he was transported to the police substation, Anderson was allowed to call his attorney, who was not immediately available. The police allowed Anderson to wait for the attorney to call back. They also permitted Anderson to call his wife and insurance adjuster, and offered to let him call anyone else he wanted to talk with.

When Anderson's attorney, Rex Lamont Butler, returned Anderson's call, Butler spoke with Anderson. Butler then discussed the implied consent law with Anchorage Police Officer Thomas Gaulke. Officer Gaulke directed Butler to his supervisor, Lieutenant Nancy Reeder. After his conversation with Reeder, Butler spoke with Anderson again. After talking with his attorney a second time, Anderson consented to providing the blood and urine samples.

The record thus shows that the police did not limit Anderson's time to consult with his attorney, and they allowed him to make other personal phone calls. There was an interval of approximately forty minutes between when the police first incorrectly asserted they had the legal authority to collect the blood and urine samples and when Anderson consented to provide the samples. Although this time interval was not great, the record supports Judge Swiderski's finding that Anderson had time to reflect on his decision to consent.

We note that Anderson initially declined to provide the breath and urine samples when the officers told him he was statutorily required to do so. Anderson continued to refuse to cooperate with the police's assertion of authority until after he had consulted with Butler. And it was not until after his second conversation with Butler that Anderson consented to provide the samples of his blood and urine. These facts lend substantial support to Judge Swiderski's conclusion that Anderson's consent was not tainted by the police's incorrect assertion of authority.

Although Anderson contends he was not fully able to consult with his attorney because of a lack of privacy, Judge Swiderski found that the attorney's side of the conversation was not overheard and that neither Anderson nor his attorney asked for more privacy. Judge Swiderski also noted that the record did not reveal the content of Anderson's conversation with his attorney.

The parties do not dispute that Butler is an experienced criminal defense attorney, and Anderson has not challenged the advice Butler gave him. Butler may have accurately advised Anderson that he was not required to provide blood and urine samples. But there were also significant advantages in having Anderson provide the samples if Anderson believed he was not impaired. Anderson had just hit and killed a pedestrian. It was in his interest to prove that he was not impaired at the time of the accident.

Why would Anderson provide the samples if there was a risk they would incriminate him? Anderson may have underestimated his level of impairment. Anderson told the police he had consumed one beer a little more than an hour before the collision. The officer investigating the accident only detected a "faint" odor of alcohol on Anderson's breath and did not observe any signs of impairment. If Anderson told Butler he was not impaired, Butler might have advised Anderson to provide the samples to protect himself against possible later criminal charges or a civil lawsuit. Or Anderson could have reached this conclusion on his own. Therefore, on the record before him, it was reasonable for Judge Swiderski to conclude that Anderson's consent to provide the samples was based upon his consultation with his attorney rather than on what he was told by the police.

In his dissent, Judge Mannheimer finds it implausible that Anderson received correct advice from his attorney. It is certainly possible that Anderson received incorrect advice. Butler is an experienced attorney, but determining whether Anderson was required by law to submit blood and urine samples

required knowledge of the supreme court's decision in *State v. Blank.*[5]

On its face, AS 28.35.031(g) requires a person to provide blood and urine samples if he "is involved in a motor vehicle accident that causes death or serious physical injury to another person." But in *Blank,* the Alaska Supreme Court held that for this statute to be constitutional, the State must also show that "probable cause to search exists and the search falls within a recognized exception to the warrant requirement."[6] As Judge Mannheimer points out, Butler had little chance to do independent research on this issue. Therefore, it is certainly possible that Butler made the same legal mistake that the police made and advised Anderson that he was required to provide the samples. Or, as we have previously pointed out, Butler might have concluded, based on Anderson's representations, that the samples would tend to exonerate Anderson. It might not have been important for Butler to know definitively what the law required if he thought the evidence would be exculpatory and that providing it would be in Anderson's interest.

So it is certainly possible that, had Anderson and/or Butler testified, Judge Swiderski might have faced a different legal question in resolving Anderson's motion to suppress. But Anderson never produced this evidence; he never asserted that Butler gave him the wrong legal advice, or that he was coerced. In the absence of this evidence, there was no reason for Judge Swiderski to presume that Anderson received bad advice. We conclude that Judge Swiderski could properly find, on the record before the court, that the State carried its burden of proving that Anderson's conversations with his attorney dissipated the taint from the police's illegal conduct, and that Anderson made the voluntary choice to provide the blood and urine samples.

*Conclusion*

Based on the record before us, we AFFIRM the trial court's denial of Anderson's motion to suppress.

BOLGER, Judge, concurring.

MANNHEIMER, Judge, dissenting.

BOLGER, Judge, concurring.

I am writing separately to emphasize the factors we have applied in the past to determine whether a suspect's consent to a search is tainted by an earlier illegal arrest. In *Brown v. Illinois,* the United States Supreme Court suggested the following factors for determining whether a confession is tainted: (1) "the temporal proximity of the arrest and the confession," (2) "the presence of intervening circumstances," and (3) "the purpose or flagrancy of the official misconduct."[1] We have applied the same factors to determine whether a suspect's consent to a search is tainted.[2] In my opinion, Judge Swiderski's decision was based on a proper application of these factors.

The first factor focuses on the time between the illegal detention and the suspect's consent. Anderson consented to provide the blood and urine samples only forty minutes after he was initially detained. This factor weighs in favor of suppression of the evidence obtained from the samples Anderson provided.

The second factor focuses on the presence of intervening circumstances. One intervening circumstance that may dissipate the taint of an illegal detention is an opportunity to contact counsel.[3] Indeed, the opportunity to actually consult with counsel is widely recognized as an important intervening circumstance.[4] I agree with Judge Swiderski's con-

---

5. 90 P.3d 156, 162 (Alaska 2004).

6. 90 P.3d at 162.

1. *Brown v. Illinois,* 422 U.S. 590, 603–04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

2. *See McBath v. State,* 108 P.3d 241, 244 (Alaska App.2005).

3. *See Kalmakoff v. State,* 199 P.3d 1188, 1201 (Alaska App.2009); *Halberg v. State,* 903 P.2d 1090, 1098 (Alaska App.1995); *see also Frink v. State,* 597 P.2d 154, 169 (Alaska 1979) (noting that consultation with counsel was a factor supporting a voluntary consent to search).

4. *See Brown,* 422 U.S. at 611, 95 S.Ct. 2254 (Powell, J., concurring); *United States v. Wellins,* 654 F.2d 550, 555 (9th Cir.1981); *People v. Boyer,* 38 Cal.4th 412, 42 Cal.Rptr.3d 677, 133 P.3d

clusion that Anderson's consultation with counsel was an important circumstance dissipating the taint of his illegal detention. This factor weighs against suppression.

The third factor focuses on the purpose or flagrancy of the official misconduct. We have described flagrant police misconduct as conduct that is "obviously illegal" or "particularly egregious." [5] In this case, the fact that the investigating officers detained Anderson in good faith reliance on a statute suggests that their conduct was not obviously illegal. The fact that the officers treated Anderson patiently and politely suggests that their conduct was not particularly egregious. There is no evidence that the officers threatened to force Anderson to provide samples; they planned to apply for a search warrant if he refused. This factor also weighs against suppression.

Ultimately, the question of whether a suspect's consent to a search is voluntary or the product of duress is a question of fact to be determined by the trial court based on the totality of the circumstances.[6] Under the circumstances of this case, Judge Swiderski could reasonably conclude that Anderson's opportunity to consult with counsel sufficiently dissipated the taint arising from the officers' good faith demand for blood and urine samples.

MANNHEIMER, Judge, dissenting.

Kevin Anderson was convicted of driving under the influence based on the results of chemical testing of his blood and urine. Anderson "consented" to let the police take the blood and urine samples only after the police unlawfully transported him to a police station for this purpose, and only after the police repeatedly—and erroneously—told both Anderson and his attorney that the police had the legal right to force Anderson to give these samples, even if he was otherwise unwilling.

My colleagues conclude that, under these circumstances, Anderson "voluntarily" consented to give the blood and urine samples to the police—and, thus, the test results were admissible against Anderson.

According to the majority opinion, we can tell that Anderson's decision was "voluntary" because the officers treated Anderson politely, because the officers were acting in good faith (that is, the officers honestly but wrongly believed that they had the authority to force Anderson to provide the blood and urine samples), and because the officers gave Anderson an ample opportunity to speak with his attorney before Anderson acquiesced in the officers' demand. I find these rationales unconvincing.

My analysis of this case begins with the fact that Anderson was subjected to an illegal arrest when the police told him that he was required to submit to blood and urine testing, and when the police then transported him to the police station for this purpose.

The pertinent statute, AS 28.35.031(g), does not authorize the police to demand blood or urine samples from a motorist unless the police have probable cause to believe that the motorist has committed a crime. *State v. Blank*, 90 P.3d 156, 161–64 (Alaska 2004). As both my colleagues and the State concede, when the officers told Anderson that he was required to accompany them to the police station and submit to blood and urine testing, the officers did not have probable cause to believe that Anderson had committed any crime. Therefore, even though Anderson peaceably acquiesced in the officers' demand, Anderson's transportation to the police station constituted an unlawful arrest.

There may have been no formal announcement of arrest, but the police restrained Anderson's freedom of movement to a "degree which the law associates with formal arrest".[1] As this Court noted in *Haag v.*

581, 609 (2006); *State v. Jones,* 558 S.W.2d 233, 238 (Mo.App.1977); *State v. Graf,* 721 N.W.2d 381, 386–87 (N.D.2006) (collecting similar cases).

**5.** *McBath,* 108 P.3d at 248.

**6.** *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Frink,* 597 P.2d at 167–68; *Punguk v. State,* 784 P.2d 246, 247 (Alaska App.1989).

**1.** Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* (4th ed.2004), § 5.1(a), Vol. 3, p. 12.

*State*, 117 P.3d 775, 779 (Alaska App.2005), "[if a person] is involuntarily transported a lengthy distance, or if the [person] is detained at another location for a lengthy period of time, the detention will be deemed an arrest."

The fact that the police honestly believed that they were entitled to take Anderson into custody for this limited purpose, and the fact that the police treated Anderson politely when they ordered Anderson to accompany them to the police station, do not change the fact that the arrest was illegal.

Because Anderson was illegally arrested, any evidence stemming from that arrest must be suppressed unless the evidence was obtained in a way sufficiently independent of the illegal arrest that we can fairly say it was "purged of the primary taint" of that arrest. *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963).

My colleagues assert that, even though Anderson was illegally arrested, his post-arrest decision to surrender blood and urine samples to the police was nevertheless "voluntary" and untainted by the unlawful arrest. In support of their conclusion, my colleagues cite the facts that (1) the officers treated Anderson politely, (2) the officers were acting in good faith when they told Anderson that they had the authority to force him to give these samples, and (3) the officers gave Anderson an ample opportunity to speak with his attorney before Anderson acquiesced in the officers' demand. Here are the reasons why I conclude that these factors are insufficient to purge the taint of Anderson's illegal arrest:

In his treatise on the law of search and seizure, Professor LaFave discusses the question of whether an arrestee's consent to a search of their person is tainted by the preceding unlawful arrest. *See* Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* (4th ed.2004), § 8.2(d), Vol. 4, pp. 79–84.

Professor LaFave notes that "an illegal arrest bears uniquely on the question of [the] voluntariness [of a person's ensuing decision to allow the police to conduct the search]"— because an unlawful arrest "constitutes a false claim of authority over the person in much the same way that reliance upon an illegal search warrant constitutes a false claim of authority over the premises named in the warrant." [2]

> Thus, just as a [person's] "consent" to search premises prompted by an illegal warrant is not voluntary, a "consent" to [a] search of the person following an illegal arrest is likewise not voluntary. The making of the arrest communicates an assertion of authority to maintain custody of the individual and, by common understanding, to also the search the person incident to that custody.

*LaFave*, § 8.2(d), Vol. 4, p. 80.

This reasoning applies even more forcefully to the facts of Anderson's case—because, here, the officers did not merely *impliedly* assert the right to search Anderson's person; rather, the officers *explicitly* asserted that they had the right to demand body samples from Anderson. This was the officers' stated justification for taking Anderson into custody in the first place. And when, at the police station, Anderson expressed uncertainty about whether to cooperate, the officers repeatedly told him that he was required by law to give them the blood and urine samples.

The fact that the officers made their demand politely does nothing to alter the involuntariness of Anderson's decision to acquiesce in the officers' demand. Likewise, the fact that the officers were operating under a good-faith mistake about their authority (or, rather, their lack of authority) to demand the body samples does nothing to alter the involuntariness of Anderson's decision.

This brings me to the last factor that my colleagues rely on: the fact that Anderson had an opportunity to consult his attorney before he made his decision.

It is true, as Judge Bolger notes in his concurrence, that courts often treat a defendant's consultation with counsel as an intervening event that will dissipate the taint of an earlier unlawful arrest. But the cases

**2.** *Id.* at 79–80.

that Judge Bolger relies on all involved situations where a defendant, after consultation with counsel, made a post-arrest decision to submit to a police interview, or to consent to a search, with full understanding that the defendant had no obligation to cooperate with the police investigation.

The courts in these cases naturally assumed that, during the defendant's consultation with counsel, the attorney advised the defendant that he or she could refuse to be questioned, or could refuse to consent to the search. But there can be no such assumption in Anderson's case. Both Anderson and his attorney were repeatedly told that Anderson had no right to refuse the police request for blood and urine samples.

There is, perhaps, some small possibility that Anderson's attorney might have fully and accurately informed Anderson that the police officers were wrong, and that Anderson did in fact have the right to refuse their demand for body samples. Under this scenario, Anderson (after receiving this legal advice, and acting with full knowledge of his Fourth Amendment rights) might have voluntarily decided to waive his rights and to cooperate with the police by giving them the body samples.

But although my colleagues apparently subscribe to this view of the matter, I find this scenario implausible. There is nothing in the record to show that Anderson received correct legal advice from his attorney. Indeed, the record strongly suggests the opposite.

After Anderson advised his attorney of the situation (*i.e.*, that Anderson had been taken into custody, and that the police were demanding body samples from him), Anderson's attorney spoke to the officer who had taken Anderson into custody. This officer told the attorney that, under the law, Anderson was obliged to furnish the body samples. Anderson's attorney then asked to speak to the officer's supervisor, a police lieutenant. The lieutenant told the attorney the same thing: Anderson was required to surrender the body samples.

There is no indication, from the police testimony, that Anderson's attorney ever contradicted the officers' assertions of authority. Indeed, the testimony of Thomas Gaulke (the officer who took Anderson into custody) indicates that Anderson's attorney acquiesced in the officers' assertions of authority and *directed* his client to provide the body samples:

> *Officer Gaulke*: [Anderson's attorney] talked to Lieutenant Reeder. Based upon [the] conversation that he had with Lieutenant Reeder—as far as the [im]plied consent law goes, [and] whatever questions he and Lieutenant Reeder had amongst one another—[the attorney] then informed Mr. Anderson to provide [the] blood sample and [the] urine sample....

The record also demonstrates that Anderson's attorney had little or no chance to independently research the law on this issue. These conversations occurred on the afternoon of Saturday, December 23, 2006—that is, on the Saturday afternoon of a three-day Christmas weekend—and the attorney was not in his office.

It is true that neither Anderson nor his attorney presented testimony to the district court concerning the content of their conversation, so we do not know exactly what was said during that conversation. However, once it was established that Anderson was subjected to an unlawful arrest, it was not *Anderson's* burden to affirmatively prove that his decision to give the body samples *was* tainted by the preceding illegal arrest. Rather, it was the *State's* burden to affirmatively show that Anderson's decision was *not* tainted by the preceding illegal arrest.

Because the State bore the burden of proof, we are not allowed to assume the facts most favorable to the State from a silent record. It was improper for the district court—and it is improper for this Court—to assume that the content of the conversation between Anderson and his attorney somehow dissipated the taint of the illegal arrest, or somehow made Anderson's decision to surrender the body samples voluntary.

For these reasons, I dissent from my colleagues' decision to affirm Anderson's conviction. The test results from Anderson's body

samples should be suppressed, and Anderson's conviction should be reversed.